UNITED STATES of America,
Plaintiff/Appellant,

v.

W.N. Daniel BROADHURST, Gregory Dorland, Joseph Arthur Broadhurst, Steven Strong Townsend, Jr., Deborah Dorland, and Beverly Elizabeth Broadhurst, Defendants/Appellees.

No. 85–1206.

United States Court of Appeals,
Ninth Circuit.

Argued Feb. 10, 1986.

Submitted June 11, 1986.

Decided Dec. 2, 1986.

Douglas G. Hendericks, Asst. U.S. Atty., Sacramento, Cal., for plaintiff/appellant.

Denise Anton, Serra, Perelson, Anton & Lichter, James Larson, San Francisco, Cal., for defendants/appellees.

Before BROWNING, TANG, and BEEZER, Circuit Judges.

TANG, Circuit Judge:

The United States appeals from the district court's order suppressing evidence of marijuana cultivation obtained as a result of aerial surveillance of a greenhouse, 612 F.Supp. 777. Based on observations made from public navigable airspace during three separate overflights, law enforcement officials obtained a state search warrant. The warrant was executed, resulting in the seizure of approximately five hundred fifty-three marijuana plants. Six defendants were charged with federal narcotics violations. The district court held that (1) all six defendants had standing to contest the search warrant, (2) the aerial surveillance was an illegal search, thus requiring suppression of evidence obtained as a result, and (3) the "good faith" exception to the exclusionary rule was inapplicable to the warrantless search. The government appeals from these findings. We vacated

submission of this case pending Supreme Court decisions in *California v. Ciraolo*, — U.S. —, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986), and *Dow Chemical Co. v. United States*, — U.S. —, 106 S.Ct. 1819, 90 L.Ed.2d 226 (1986). We have jurisdiction under 18 U.S.C. § 3731. We reverse.

## FACTS AND PROCEDURAL HISTORY

The evidence suppressed in this case was seized in a search of certain buildings at 17172 Lague Road in Yuba County, California ("the Lague Road property"). The Lague Road property is located in a rural, sparsely populated area, and contains eighty acres. On it sit a two-story residence, a garage, a green-sided shed ("the small greenhouse"), and a large greenhouse, the aerial surveillance of which is at issue in this case. The garage lies approximately fifteen feet from the residence; the small greenhouse, about seventy-five yards from the residence; and the large greenhouse, about one hundred twenty-five yards from the residence. The terrain in between the house and the large greenhouse is hilly and contains grass and oak trees. No road apparently leads from the house to the greenhouse and the greenhouse is not visible from the house. At the time of the search, the area of the Lague Road property near the greenhouse was heavily posted with "no trespassing" signs and fenced with barbed wire. From the nearest public road, the greenhouse appears as a large, opaque, green-sided barn.

In January of 1982, officer James Lovoi of the Sutter County Sheriff's Department and agent Del Polish of the Drug Enforcement Administration (DEA) met with a citizen informant who told them that, while deer hunting during the previous October or November, the informant had seen a large greenhouse full of six feet tall marijuana plants. The three traveled to the Lague Road property in Yuba County. There, the informant pointed out a large, green structure, partially hidden by trees, and apparently identified it as the greenhouse observed during the previous October or November. After making these observations, the officers and the informant left the area. In April 1982, a county deputy sheriff told Lovoi that an anonymous informant had told him that he had seen "marijuana gardens around some greenhouses on Lague Road" while deer hunting in 1981.

On May 26, 1982, Lovoi and California narcotics agents went on routine aerial patrol of the Yuba County foothills, including the Lague Road area. Each of the officers was experienced in the aerial identification of marijuana. They sighted the greenhouse on the Lague Road property while flying at an altitude of not less than one thousand feet. The officers could discern no green plants, but did see light emanating from the building. Lovoi and narcotics agents made a second routine aerial overflight on July 27, 1982, from an altitude of not less than one thousand feet. On this occasion, Lovoi reportedly observed green plants over six feet tall inside the greenhouse. During the overflight, the airplane was flown repeatedly in circles around the greenhouse, so as to permit viewing of the contents from various angles through the sides of the greenhouse. Apparently, nothing was visible through the roof of the greenhouse. Through the sides of the greenhouse, however, the agents discerned shadows, shapes of plants, and shades of green. The plants were of a color and height "consistent with marijuana." Following this overflight and before the third and final overflight, Lovoi ascertained that there were "no trespassing" signs and barbed wire near the greenhouse and that there was no record of a commercial nursery on the property. On August 4, 1982, Lovoi and narcotics agents conducted a third overflight of the Lague Road property. On this occasion, the agents observed that the greenhouse contained green plants over six feet tall.

Lovoi applied for and obtained a search warrant for the Lague Road property on August 12, 1982. Five days later, officers executed the warrant, and seized some 553 marijuana plants from the greenhouse and from a second structure on the property. On July 11, 1984, all six defendants were

indicted on one count of conspiracy to manufacture and possess with intent to distribute marijuana in violation of 21 U.S.C. §§ 841(a)(1), 846. Defendants Daniel Broadhurst, Gregory Dorland, Joseph Broadhurst, and Beverly Broadhurst were also indicted for knowingly and intentionally manufacturing marijuana in violation of 21 U.S.C. § 841(a) and for knowingly and intentionally possessing with intent to distribute marijuana in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. On June 21, 1985, in a published memorandum and order [1], the district court granted defendants' motion to suppress the evidence obtained as a result of the overflights, on the ground that the aerial surveillance constituted a warrantless search in violation of the Fourth Amendment. 612 F.Supp. at 795. The government filed this appeal pursuant to 18 U.S.C. § 3731.

**DISCUSSION**

I. *Did All Defendants Have Standing to Challenge the Aerial Surveillance?*

The district court's factual findings on the jurisdictional issue of standing must be accepted unless clearly erroneous. *Bruce v. United States*, 759 F.2d 755, 758 (9th Cir.1985). *See United States v. McConney*, 728 F.2d 1195, 1200 (9th Cir.), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). The district court's ultimate legal conclusion regarding standing is subject to de novo review. *Bruce*, 759 F.2d at 758. The district court found that each of the six defendants had standing to challenge the aerial surveillance. 612 F.Supp. at 786.

The government challenges the standing of defendants Gregory Dorland, Deborah Dorland, Stephen Townsend and Daniel Broadhurst, none of whom lived on the property at the time of the execution of the search warrant. The government concedes that both Beverly and Joseph Broadhurst had standing because they were living on the property. As to Stephen Townsend, the government contends that, since Town-

send purchased the Lague Road property and made mortgage payments under a false name, he lacks standing. A similar contention is made with regard to Deborah Dorland who, the government asserts, had no supervisory role or proprietary interest in the Lague Road property, and thus lacks standing. Finally, despite the participation in the purchase of the property and other activities related to the property on the part of Gregory Dorland and Daniel Broadhurst, the government submits that "this is still not a sufficient showing" to give them standing. These contentions lack merit.

■ Fourth Amendment rights are personal. As such, they may not be vicariously asserted. *Rakas v. Illinois*, 439 U.S. 128, 134, 99 S.Ct. 421, 425–26, 58 L.Ed.2d 387 (1978), *quoting Alderman v. United States*, 394 U.S. 165, 174, 89 S.Ct. 961, 967, 22 L.Ed.2d 176 (1969). Rather, Fourth Amendment rights may be enforced only by one whose own Fourth Amendment protection was infringed by the search or seizure. *Id.; Simmons v. United States*, 390 U.S. 377, 389, 88 S.Ct. 967, 973–74, 19 L.Ed.2d 1247 (1968). Analysis of whether a particular defendant enjoys that protection properly belongs not under the traditional heading of standing, however, but instead under substantive Fourth Amendment doctrine which examines whether a particular defendant may assert a legitimate expectation of privacy. *Rakas*, 439 U.S. at 140, 99 S.Ct. at 428–29.

■ It is clear that one may have a legally sufficient interest in a place other than her own house so as to extend Fourth Amendment protection from unreasonable searches and seizures in that place. *Jones v. United States*, 362 U.S. 257, 265–67, 80 S.Ct. 725, 733–34, 4 L.Ed.2d 697 (1960); *Rakas*, 439 U.S. at 142, 99 S.Ct. at 429–30. This Court and others have examined various factors in determining whether defendant may assert a legitimate expectation of privacy in a given space or item.[2] Clearly,

---

**1.** *United States v. Broadhurst*, 612 F.Supp. 777 (E.D.Cal.1985).

**2.** Such factors have included defendant's possessory interest in the thing searched or seized, *see United States v. Quinn*, 751 F.2d 980 (9th Cir.

a formalized arrangement among defendants indicating joint control and supervision of the place searched is sufficient to support a legitimate expectation of privacy. *United States v. Johns*, 707 F.2d 1093, 1100 (9th Cir.1983) (aircraft pilots who dropped off marijuana had standing to contest search of truck carrying marijuana), *rev'd on other grounds*, 469 U.S. 478, 105 S.Ct. 881, 83 L.Ed.2d 890 (1985); *United States v. Pollock*, 726 F.2d 1456, 1465 (9th Cir.1984) (arrangement with owner of premises for manufacture of drugs on premises gave defendant standing to challenge search of premises); *United States v. Perez*, 689 F.2d 1336, 1338 (9th Cir.1982) (exercise of joint control and supervision of truck demonstrated reasonable expectation of privacy in gas tank which contained contraband).

Residence or presence on the premises at the time of the search are unnecessary to a determination of standing. *See, e.g., Johns*, 707 F.2d at 1099–1100 (defendants absent at time of search). Nor is the argument convincing that Deborah Dorland was a "mere employee" who had nothing more than the status of an invitee, notwithstanding the government's citation to authority from outside the Circuit. Arcane distinctions of property or tort law do not control Fourth Amendment inquiry. *United States v. Salvucci*, 448 U.S. 83, 91, 100 S.Ct. 2547, 2552–53, 65 L.Ed.2d 619 (1980) (citing *Rakas*, 439 U.S. at 143, 99 S.Ct. at 430). The record amply indicates a formalized, ongoing arrangement between all six defendants for the cultivation of marijuana in the greenhouse. Gregory Dorland negotiated the purchase of the property, supervised the caretaker, and was physically present on more than one occasion. Daniel Broadhurst acted as "foreman," and hired the caretaker. Stephen Townsend purchased the property, made mortgage payments on it, and applied for a post office

box. Deborah Dorland cleaned and processed marijuana and made notations in a diary regarding marijuana cultivation. On these facts, it is immaterial that these four defendants failed to show that they lived on the property or that they were physically present at the time of the search.

Legitimate presence on the premises is, of course, relevant to a legitimate expectation of privacy. *Pollock*, 726 F.2d at 1465 (citing *Rakas*, 439 U.S. at 142–43, 99 S.Ct. at 429–30). But by no means is presence talismanic to the determination of standing, any more than physical invasion is talismanic to a determination of whether there has been a "search." In either case the *Katz* analysis of whether defendant enjoys a legitimate expectation of privacy governs. Participation in an arrangement that indicates joint control and supervision of the place searched sufficiently establishes such an expectation. *See Pollock*, 726 F.2d at 1465, *Johns*, 707 F.2d at 1100, *Perez*, 689 F.2d at 1338. The district court's factual determinations were not clearly erroneous. The court's legal conclusion of standing which was based on those determinations was correct.

II. *Did the Overflights Constitute a "Search" for which a Warrant Was Required Under the Fourth Amendment?*

■ Whether police conduct amounts to a "search" within the meaning of the Fourth Amendment is a mixed question of law and fact. In such a case, however, consideration of abstract legal principles which inform constitutional jurisprudence is required. Thus, de novo review is appropriate. *United States v. McConney*, 728 F.2d 1195, 1203 (9th Cir.1984), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984) (citing *International Ladies' Gar-*

1984) (ownership of boat and marijuana seized, joint venture), *cert. dismissed*, — U.S. —, 106 S.Ct. 1623, 89 L.Ed.2d 803 (1986), measures taken by the defendant to insure privacy, *see Katz v. United States*, 389 U.S. 347, 352, 88 S.Ct. 507, 511–12, 19 L.Ed.2d 576 (1967) (shutting door of telephone booth), and whether the container

from which contraband is seized demonstrates a privacy interest in the contents, *see United States v. Hershenow*, 680 F.2d 847, 855–56 (1st Cir.1982) (no legitimate expectation of privacy in box stored in barn in which defendant had no interest or right of access).

*ment Workers' Union v. Sureck*, 681 F.2d 624 (9th Cir.1982) (issue of whether INS factory sweep constituted "search" merited de novo review), *rev'd on other grounds*, 466 U.S. 210, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984)). The district court held that defendants had a reasonable expectation of privacy in the greenhouse, and thus that the overflights constituted a warrantless search. Upon analysis of the facts under the recently decided cases of *Ciraolo*, ⸺ U.S. ⸺, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986), and *Dow*, ⸺ U.S. ⸺, 106 S.Ct. 1819, 90 L.Ed.2d 226 (1986), we must reverse.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. Since the decision of the U.S. Supreme Court in *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), the question whether particular governmental conduct constitutes a "search" for Fourth Amendment purposes has turned upon whether that conduct intruded on a constitutionally protected expectation of privacy. *Smith v. Maryland*, 442 U.S. 735, 739–40, 99 S.Ct. 2577, 2579–80, 61 L.Ed.2d 220 (1979). In holding the warrantless wiretapping of conversations in a phone booth to be violative of the Fourth Amendment, the Supreme Court discarded the traditional analysis of *Olmstead v. United States*, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928), which examined whether an actual physical invasion of the house or "curtilage" had occurred. *Id.* at 466, 48 S.Ct. at 568. *See also id.* at 461, 48 S.Ct. at 566–67 (citing *Amos v. United States*, 255 U.S. 313, 41 S.Ct. 266, 65 L.Ed. 654 (1921). In its place, the Court substituted an approach which examined not how, but whether, the government has violated the privacy upon

which the individual has justifiably relied. *Katz*, 389 U.S. at 353, 88 S.Ct. at 512. In a concurring opinion, Justice Harlan explained the Court's analysis in terms which now represent the standard articulation of *Katz*: whether the government has intruded upon the individual's "reasonable expectation of privacy." *Id.* at 360, 88 S.Ct. at 516 (Harlan, J., concurring). Thus, in *Katz*, the Court examined not whether the government had violated Katz' property interest in a phone booth, but whether it had violated Katz' justifiable reliance on the privacy of the phone booth. 389 U.S. at 353, 88 S.Ct. at 512. Such an approach recognizes that the "constitutionally protected area" analysis failed to protect against surveillance techniques made possible through technological advances which enabled police to conduct intrusive surveillance without a physical invasion.[3] *See Ciraolo*, 106 S.Ct. at 1815 (Powell, J., dissenting) (citing *Goldman v. United States*, 316 U.S. 129, 139–41, 62 S.Ct. 993, 998–99, 86 L.Ed. 1322 (1942) (Murphy, J., dissenting); *Olmstead*, 277 U.S. at 474, 48 S.Ct. at 571 (Brandeis, J., dissenting)).

*Katz* and its progeny enunciate a two-pronged inquiry as to whether the government has intruded upon an individual's reasonable expectation of privacy. First, the court asks whether the individual, by his conduct, has exhibited a subjective expectation of privacy. *Smith*, 442 U.S. at 740, 99 S.Ct. at 2580 (*quoting Katz*, 389 U.S. at 361, 88 S.Ct. at 516–17 (Harlan, J., concurring)). Second, the court asks whether that subjective expectation is one that society is prepared to recognize as reasonable. *Id., quoting Katz*, 389 U.S. at 361, 88 S.Ct. at 516–17 (Harlan, J., concurring).

Thus, the first question is: did defendants, by their conduct, exhibit a subjective expectation of privacy?[4]

---

**3.** Aerial surveillance clearly is an example of such a technological advance. Cf. *United States v. Allen*, 675 F.2d 1373, 1380 (9th Cir.1980) (given sophistication of electronic photographic devices, probably few unenclosed locations exist which could not be observed from some airborne location), *cert. denied*, 454 U.S. 833, 102 S.Ct. 133, 70 L.Ed.2d 112 (1981).

**4.** The district court so held, stating that defendants did far more than a typical rural resident would have done if concerned with protecting the privacy of the contents of a similar structure. 612 F.Supp. at 791–92.

### A. *Subjective Expectation of Privacy*

Defendants clearly went to great lengths to prevent anyone from seeing anything inside the greenhouse. It is obvious that, by use of metal roofing, translucent siding, a fiberglass screen which covered openings in the roof, mesh screening, employment of a caretaker to raise and lower a screen on the side of the building, barbed wire, and "no trespassing" signs, defendants attempted to block all views of the interior of the greenhouse from every accessible vantage point. One or more of the defendants occasionally climbed a nearby hill to see if the interior of the greenhouse was visible to members of the general public. 612 F.Supp. at 792. Defendants used false names in the purchase of the property and in transactions related to the greenhouse.

Defendants' actions demonstrate nothing else if not a subjective expectation of privacy in the interior of the greenhouse. Similar efforts have been held to establish at least a subjective expectation of privacy, and thus to satisfy the first prong of *Katz*. *See, e.g., Ciraolo*, 106 S.Ct. at 1811 (ten-foot fence around back yard which contained marijuana plants), *Dow*, 106 S.Ct. at 1825 (reasonable, legitimate, and objective expectation of privacy within interior of covered building). *See also State v. Knight*, 63 Hawaii 90, 621 P.2d 370, 374 (1980) (defendants' covering of greenhouse with materials so as to shield contents exhibited subjective expectation of privacy). The proximity of an airport did little to diminish the subjective expectation of privacy. Defendants' actions in blocking

views through both the roof as well as the siding, and in climbing a nearby hill to ascertain if aerial views into the interior were possible, confirm defendants' subjective expectation that, even as to aerial observers, the greenhouse contents would remain invisible.[5] In light of these strenuous measures, the district court's conclusion of a subjective expectation of privacy was correct.

### B. *Objective Expectation of Privacy*

Should we determine that defendants' subjective expectation was one which society is prepared to recognize as reasonable, then the state's circling overflights rise to the level of a "search" which, because it lacked a warrant in this case, violated the Fourth Amendment. *See Smith v. Maryland*, 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979), *quoting Katz*, 389 U.S. at 361, 88 S.Ct. at 516–17 (Harlan, J., concurring). We now address this question in light of *Ciraolo* and *Dow*.

In *Ciraolo*, a sharply divided[6] Supreme Court held that the defendant's expectation of privacy in a back yard marijuana patch was unreasonable in light of routine private and commercial flight in the public airways. 106 S.Ct. at 1813. The Court reasoned that, despite the erection of a ten-foot fence around the yard, routine private and commercial aviation rendered any expectation of privacy from unenhanced visual observations unreasonable. *Id.* Although the marijuana plants were located within the "curtilage,"[7] the plants were

---

**5.** The government would turn *Katz* on its head in arguing that defendants' measures show that they "expected surveillance" and thus could have had no subjective expectation of privacy. Presumably the government would not so blithely argue the obverse had defendants chosen instead to cultivate their marijuana crop in their front yard, thus indicating that they did not "expect surveillance."

**6.** Chief Justice Burger wrote the opinion, in which Justices White, Rehnquist, Stevens and O'Connor joined. Justice Powell's dissent was joined by Justices Brennan, Marshall and Blackmun.

**7.** Defendants have not raised the argument that the greenhouse, which was located one hundred twenty-five yards from the house, was within the "curtilage," and therefore we need not dwell on it here. It is clear, however, that a structure need not be within the curtilage in order to have Fourth Amendment protection. *See Oliver v. United States*, 466 U.S. 170, 178 n. 8, 104 S.Ct. 1735, 1741 n. 8, 80 L.Ed.2d 214 (1984) (Fourth Amendment protects offices and commercial buildings, in which there may be legitimate expectations of privacy), (citing *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 311, 98 S.Ct. 1816, 1819–20, 56 L.Ed.2d 305 (1978); *G.M. Leasing Corp. v. United States*, 429 U.S. 338, 355, 97 S.Ct. 619, 630, 50 L.Ed.2d 530 (1977)). Indeed, so long as a person may claim a legitimate expecta-

nevertheless visible to the naked eye. *Id.* The Court dismissed as irrational the distinction between observation made in a "routine patrol" and "focused observation" of a particular home, reasoning that the defendant's expectation of privacy from aerial observation could not differ as between two airplanes passing overhead at identical altitudes for different purposes. *Id.* at 1813 n. 2. In *Dow*, while acknowledging Dow's "reasonable, legitimate, and objective" expectation of privacy in its covered buildings, the Court held that the warrantless taking of aerial photographs of the open areas of Dow's plant complex from an aircraft lawfully in public navigable airspace was not a "search." 106 S.Ct. at 1827. Once again sharply divided[8], the Court discussed *Dow* in terms of "open fields,"[9] reasoning that the open areas of a plant complex were simply more like open fields than they were like curtilage. *Id.* The Court also rested its conclusion upon the lessened expectation of privacy in com-

mercial property, given government inspection. *Id.* at 1826.

In this case, it is apparent that the police saw, from public navigable airspace, what anyone else could have seen from that position: outlines, shadows and colors of vegetation which resembled marijuana. For all of defendants' efforts, it would have served them little to make their greenhouse so opaque so as to deny sunlight to their crop. Accordingly, they knowingly exposed the translucent sides of their greenhouse to those who might view it from public navigable airspace. The officers' view was unenhanced by any equipment. The fact that their observation was focused on defendants' greenhouse, rather than routine and unfocused, does not alter our conclusion. *See Ciraolo*, 106 S.Ct. at 1813 n. 2. (defendant's expectations of privacy can hardly differ when two airplanes fly overhead at identical altitudes, simply for different purposes).

---

tion of privacy in a structure or item, Fourth Amendment protection extends to that structure or item. *See, e.g., Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979) (luggage); *Marshall*, 436 U.S. at 311, 98 S.Ct. at 1819–20 (electrical and plumbing installation facilities); *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977) (footlocker); *See v. Seattle*, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967) (warehouse); *Katz*, 389 U.S. 347, 88 S.Ct. at 507 (telephone booth). The post-*Katz* extension of Fourth Amendment protection reflects *Katz'* teaching that determination of these questions turns on the degree of privacy which the individual is seeking to preserve, rather than upon resort to the "ancient concept of curtilage." *See Wattenburg v. United States*, 388 F.2d 853, 858 (9th Cir.1968). *See generally* Note, The Fourth Amendment in the Age of Aerial Surveillance: Curtains for the Curtilage? 60 N.Y.U.L.Rev. 725, 737 (October 1985) (post-*Katz* courts have ignored curtilage doctrine, or found it archaic and unnecessary).

**8.** As in *Ciraolo*, Chief Justice Burger wrote an opinion in which Justices White, Rehnquist, Stevens and O'Connor joined; Justice Powell dissented in part, and was joined by Justices Brennan, Marshall and Blackmun.

**9.** Governmental intrusion upon "open fields" is not an unreasonable search proscribed by the Fourth Amendment. *Oliver*, 466 U.S. at 183, 104 S.Ct. at 1743–44. *See also Hester v. United*

*States*, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924). The *Oliver* court applied *Katz'* expectation of privacy analysis to Oliver's farm and concluded that an individual simply may not legitimately demand privacy for activities conducted outdoors in fields, except in the area immediately surrounding the home. *Oliver*, 466 U.S. at 178, 104 S.Ct. at 1741. Emphasizing that the police and the public may have access to the open fields, despite fences and "no trespassing" signs, the Supreme Court held that any expectation of privacy in the open fields was unreasonable. *Id.* at 179, 104 S.Ct. at 1741. The term "open fields" applies to any unoccupied or undeveloped area outside of the curtilage; an area need be neither open nor a field to be an "open field" exempt from Fourth Amendment protection. *Id.* at 180 n. 11, 104 S.Ct. at 1742 n. 11.

We base our holding today on the lack of a reasonable expectation of privacy in a translucent greenhouse through which contraband is visible from public navigable airspace. Therefore, we need not discuss the location of defendants' greenhouse in an "open field" as a basis for decision. We note, however, the emphasis which the *Oliver* court laid upon the lack of a legitimate expectation of privacy for "activities conducted *out of doors in fields* ..." *Id.* 466 U.S. at 178, 104 S.Ct. at 1741 (emphasis supplied). In this case, the construction of a greenhouse strongly suggests that *Oliver* is inapplicable. The district court so held. 612 F.Supp. at 787.

Nor does *Dow*'s acknowledgment of a reasonable and legitimate expectation of privacy in a covered commercial building compel a different result. A critical distinction between the buildings in *Dow* and defendants' greenhouse is that the walls of Dow's buildings did not betray illicit activity to the world. *See Dow*, 106 S.Ct. at 1825. *See also United States v. Johns*, 469 U.S. 478, 486, 105 S.Ct. 881, 886, 83 L.Ed.2d 890 (1985) (certain containers may not support reasonable expectation of privacy because contents may be inferred from their outward appearance) (citing *Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979)); *Blalock v. State*, 483 N.E.2d 439 (Ind.1985) (no expectation of privacy in greenhouse with translucent roof through which color of plants resembling marijuana was visible); *United States v. Dunn*, 674 F.2d 1093, 1100 (5th Cir.1982) (location, siding and screening of barn prevented view of contents unless viewer stood immediately adjacent to barn), *vacated*, 467 U.S. 1201, 104 S.Ct. 2380, 81 L.Ed.2d 340 (1984)[10], *reinstated*, 782 F.2d 1226 (5th Cir.1986)[11]; *Wheeler v. State*, 659 S.W.2d 381, 391 (Tex.Crim.App.1982) (defendants had reasonable expectation of privacy in opaque greenhouse located in remote rural area).

The proximity of defendants' greenhouse to a nearby airport further detracted from the reasonableness of the expectation that their greenhouse would remain free of aerial observation. *See United States v. Allen*, 675 F.2d 1373, 1379, 1380 (9th Cir. 1980), *cert. denied*, 454 U.S. 833, 102 S.Ct. 133, 70 L.Ed.2d 112 (1981). In that case, we held that the proximity of defendants' property to federal land and airspace which was routinely traversed by Coast Guard helicopters made impossible a reasonable expectation of privacy from aerial, sense-enhanced surveillance. *Id.* at 1381.

*Katz* rightly warned of the dangers created by technological advances by which the police conduct surveillance. Yet the result today can hardly be said to approve of intrusive technological surveillance where the police could see no more than a casual observer. In this case, no more sophisticated technology was used than a single-engine fixed-wing aircraft. *See Ciraolo*, 106 S.Ct. at 1813 (one can reasonably doubt that in 1967 Justice Harlan considered an aircraft within the category of future "electronic" developments that could stealthily intrude upon an individual's privacy), and no more intrusive techniques were used than to fly in navigable airspace, on three separate occasions, near defendants' greenhouse. *Compare NORML v. Mullen*, 608 F.Supp. 945, 957 (C.D.Cal. 1985) (highly disruptive character of low helicopter flights distinguishes them from common airplane overflights to which society is accustomed), *remanded*, 796 F.2d 276 (9th Cir.1986).

What a person knowingly exposes to public view is not protected by the Fourth Amendment. *Katz*, 389 U.S. at 351, 88 S.Ct. at 511. The Constitution does not require one to build an opaque bubble over himself to claim a reasonable expectation of privacy. *Allen*, 675 F.2d at 1380. Where the bubble he builds, however, allows persons in navigable public airspace to view his illicit activity, whatever expectation of privacy he has certainly is not reasonable. *See Ciraolo*, 106 S.Ct. at 1813; *Dow*, 106 S.Ct. at 1827.

## CONCLUSION

The district court's factual findings regarding standing were not clearly erroneous, and its legal conclusion that each of the six defendants had standing to challenge the aerial surveillance was correct. While the defendants had a subjective expectation of the privacy in the greenhouse, that expectation was not one which society is prepared to observe as reasonable. Therefore, the overflights conducted by the officers did not amount to a "search" which would have required a warrant un-

---

**10.** The Supreme Court vacated and remanded for further consideration in light of its decision in *Oliver. Id.*

**11.** In light of *Oliver*, the Fifth Circuit held that the barn was within the protected curtilage of defendant's home. On that basis, it reinstated its original opinion reported at 766 F.2d 880.

der the Fourth Amendment. The district court thus erred in granting defendants' motion to suppress the evidence obtained on the basis of the overflights. Accordingly, the order granting defendants' motion to suppress is reversed and the cause remanded for proceedings not inconsistent with this opinion.[12]

REVERSED and REMANDED.

12. Having determined that the police conduct in this case did not amount to a "search" within the meaning of the Fourth Amendment, the warrant obtained based on the overflight was not tainted. There being no other challenge on appeal to the sufficiency of the search warrant, it is unnecessary to discuss whether the "good faith" exception to the exclusionary rule should apply in this case.