946 F.2d 901
 NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Clyde PEEK, Defendant-Appellant,
UNITED STATES of America, Plaintiff-Appellee,
v.
Robert PEEK, Defendant-Appellant.
 Nos. 90-1343, 90-1351.
 United States Court of Appeals, Tenth Circuit.
 Oct. 22, 1991.
 
 Before HOLLOWAY, LOGAN and BALDOCK, Circuit Judges.
 ORDER AND JUDGMENT*
 LOGAN, Circuit Judge.
 
 
 1
 Defendants Clyde Peek and Robert Peek were convicted pursuant to guilty pleas of possession with intent to distribute 1,000 or more marijuana plants, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(vii). They reserved the right to appeal the denial of their motions to suppress evidence obtained as a result of law enforcement officers' aerial surveillance and warrantless search of a greenhouse in which defendants were growing a large number of marijuana plants.
 
 
 2
 As we construe their arguments on appeal, defendants challenge the district court's conclusion that the aerial surveillance did not violate their Fourth Amendment rights, and they argue that the district court erred in finding that they lacked standing to challenge the on-ground search of the greenhouse. We find it unnecessary to address the standing issue because, assuming defendants had a legitimate expectation of privacy in the interior of the greenhouse, there was valid third-party consent to the search. We ascertain no other illegality in the officers' actions.
 
 
 3
 The property at issue is owned or leased by a codefendant, Christine Haneke, who purportedly had subleased it to a Mark Russell. Russell is a fictitious person invented by defendants. Clyde Peek acknowledged that he drafted the sublease and Robert Peek signed the name Mark Russell to conceal their interest and involvement in the marijuana growing operation.
 
 
 4
 The greenhouse is a structure erected by defendants and located in a rural area approximately 600 yards from a residence on the subleased property. There is a fence with a locked gate on the premises between the road and the residence, and a second fence with a gate some distance behind the residence. State officers had spotted the greenhouse from an airplane they were using for surveillance in connection with a marijuana eradication project. From their airplane they allegedly could see through its translucent roof that some kind of plants were growing in the greenhouse. The officers observed the greenhouse with their naked eyes and also with binoculars and a camera with a telescopic lens.
 
 
 5
 Approximately one week after the aerial observation of the greenhouse, investigating officers climbed over the locked gate near the county road--which did not have a "no trespassing" sign--approached the residence, and discovered defendant Clyde Peek on the premises. Clyde Peek denied knowing anything of the greenhouse. He asserted that his property went only to the second fence and gave permission to the officers to go as far as the second fence in their investigation.
 
 
 6
 Thereafter, some of the officers smelled what they believed to be the odor of marijuana. They then went past the second fence, approached the greenhouse, looked through a hole in its wall, and saw a large number of growing marijuana plants. The officers did not enter the greenhouse at that time.
 
 
 7
 Subsequently, the officers encountered Robert Peek on the property, and he also disclaimed any interest in the greenhouse or the property on which it was located. Clyde Peek in the meantime had left the premises and later was located at Haneke's apartment. Clyde Peek there gave a different story concerning his presence at the residence, while continuing to disclaim any interest in the area containing the greenhouse. Haneke also disclaimed any interest in the greenhouse, referring to the sublease, and she signed a written consent to search the property and its outbuildings. The following day, still without a search warrant but with Haneke's consent, the officers returned to the property, searched the greenhouse, and found it to be full of growing marijuana plants.
 
 
 8
 * When reviewing a denial of a motion to suppress we must accept the district court's findings of fact unless they are clearly erroneous. United States v. McKinnell, 888 F.2d 669, 672 (10th Cir.1989). We review de novo the ultimate legal question of reasonableness under the Fourth Amendment. Id.
 
 
 9
 Applying the standard of California v. Ciraolo, 476 U.S. 207 (1986), the district court found that the aerial surveillance of the greenhouse did not violate the Fourth Amendment and denied defendants' motion to suppress as to the overflight. On appeal, defendants cite facts brought out at the suppression hearing regarding a duplication of the overflight and certain witnesses' estimates that the altitude of the overflight was lower than the altitude testified to by the law enforcement officials. At the suppression hearing Robert Peek estimated the aircraft's altitude at 200 to 400 feet. Defendants assert "that the flight path or altitude of the airplane violated applicable law regulation [sic] and that the information contained was not visably [sic] naked to the eye." See Appellant's Opening Brief at 16. At the suppression hearing the law enforcement officers testified that they first observed the greenhouse from an altitude of approximately 1,500 feet, they descended to approximately 800 feet, but did not descend below 500 feet. Faced with this conflicting testimony as to the altitude of the overflight, the district court found that the overflight was "from a reasonable distance up in the air." App., Ruling, at 4. The district court also found that the over-flight occurred in a rural area, and that the greenhouse was at least two-tenths of a mile from any residence and clearly outside the curtilage of the residence. We cannot say that the district court's findings of fact are clearly erroneous. It is clear that the district court credited the testimony of the law enforcement officials, and that by finding that the altitude was "reasonable" the district court implicitly found the altitude was not less than 500 feet.
 
 
 10
 Although Ciraolo involved the aerial observation of curtilage from an altitude of 1,000 feet, see 476 U.S. at 209, the Supreme Court has approved of aerial surveillance at lower altitudes. See Florida v. Riley, 488 U.S. 445, 451-52 (1989) (plurality opinion) (helicopter surveillance of partially covered greenhouse at 400 feet); see also id. at 451 n. 3 ("Federal Aviation Administration (FAA) regulations permit fixed-wing aircraft to be operated at an altitude of 1,000 feet while flying over congested areas and at an altitude of 500 feet above the surface in other than congested areas...."); id. at 452-55 (O'Connor, J., concurring in the judgment) (arguing the plurality overemphasizes compliance with FAA regulations; proper inquiry is whether defendant had a reasonable expectation of privacy from aerial observation, based in part on regularity with which members of the public travel at that altitude). At the suppression hearing Sheriff Wally Wessell testified that he frequently has received complaints about low-flying aircraft in the general area of the property and that there is an airfield in the vicinity.
 
 
 11
 Because aerial observers from public navigable airspace could see green plant material in the greenhouse, which was clearly outside the curtilage, any subjective expectation by defendants of privacy from aerial observation is not "one that society is prepared to recognize as 'reasonable.' " Katz v. United States, 389 U.S. 347, 361 (1967) (Harlan, J., concurring); see also United States v. Broadhurst, 805 F.2d 849, 854-57 (9th Cir.1986) (overflight observation, unenhanced by any equipment, of greenhouse containing marijuana held not a search). This result is not affected by the fact that the officers enhanced their aerial observation of the greenhouse by using a camera and binoculars. See Dow Chem. Co. v. United States, 476 U.S. 227, 239 (1986) (taking aerial photographs of industrial plant from navigable airspace not a search prohibited by Fourth Amendment); United States v. Lace, 669 F.2d 46, 51 (2d Cir.) (on-ground observation of outdoor area, not into interior of a home, aided by binoculars and other visual aids not unlawful), cert. denied, 459 U.S. 854 (1982).
 
 II
 
 12
 The district court denied defendants' motion to suppress regarding the on-ground search of the greenhouse on several bases: their disclaimers of interest constituted abandonment; defendants had no standing to complain of the search; the consent of defendant Clyde Peek; and the consent of Christine Haneke. On appeal the government relies principally on the lack of standing, but also on Haneke's consent and the consent given by Clyde Peek.
 
 
 13
 The district court specifically stated that
 
 
 14
 [a]s to the ... search of the greenhouse itself, I find that it was clear legal consent, uncontested, by the person who had the lease of the land on which the greenhouse was built, and thus of the greenhouse, namely Christy Haneke, who voluntarily and in writing as well as orally consented to the second search.
 
 
 15
 App., Ruling, at 4. The voluntariness of a consent search "is a question of fact to be determined by the district court from the totality of the circumstances." United States v. Wright, 932 F.2d 868, 878 (10th Cir.1991) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 248-49 (1973)). On appeal, defendants do not in any way contest the district court's finding regarding Haneke's consent. Indeed, although defendants argue extensively the issue of standing, in their brief defendants mention Haneke's consent only once--in their statement of facts where they simply quote that part of the district court's ruling quoted above.
 
 
 16
 The ability of a third party, in proper circumstances, to give consent to search that is binding on others is clear. The Supreme Court has said
 
 
 17
 that when the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected.
 
 
 18
 United States v. Matlock, 415 U.S. 164, 171 (1974) (footnote omitted).
 
 
 19
 The record makes it apparent that Haneke was aware of the fictitiousness of Mark Russell, the named sublessee. This is sufficient to support finding her a coconspirator of defendants with an interest in the intended fruits of the marijuana-growing operation. Her written consent, after being advised of her right not to give it, was sufficient to allow the officers legal access to the premises. Therefore, even if we assume that defendants had a legitimate expectation of privacy with respect to the interior of the greenhouse, Haneke's consent made the subsequent on-ground warrantless search of the greenhouse valid.
 
 
 20
 Our holding in Part I, supra, that the aerial surveillance in this case did not violate the Fourth Amendment, together with the consent of Haneke to the actual search of the greenhouse, leaves open to possible dispute only the actions of the law enforcement officers after the aerial surveillance was completed and before Haneke consented to the search. During this time period the officers climbed over the locked gate on the premises, walked to the house, found Clyde Peek, and received his permission to go as far as the second fence. About the time Clyde Peek left, some of the officers smelled the odor of marijuana, went past the second fence and up to the greenhouse, looked through a hole in its wall, and observed marijuana plants inside. The officers, however, did not physically enter the greenhouse until after Haneke later consented to the search.
 
 
 21
 These actions of the officers were permissible. Law enforcement officers may approach a person's house for the purpose of conducting an interview. See United States v. Daoust, 916 F.2d 757, 758 (1st Cir.1990); Davis v. United States, 327 F.2d 301, 303 (9th Cir.1964) (absent express prohibition against trespass, anyone--including police officers--may openly walk up to a home to ask questions of the occupant). Here, although the first gate was locked, there were no "no trespassing" signs; thus the officers' actions in entering the property and approaching the residence from which Clyde Peek emerged were permissible. While questioning Clyde Peek, the officers received his permission to go to the second fence; thus, their actions in proceeding from the area of their interview with Clyde Peek to the second fence were pursuant to a clearly valid consent.
 
 
 22
 As to the actions of some officers going beyond the second fence and up to the greenhouse, which was located in a remote area about 600 yards away from the residence and clearly outside its curtilage, this area of the premises would be within the "open fields" doctrine of Oliver v. United States, 466 U.S. 170, 181 (1984) ("an individual has no legitimate expectation that open fields will remain free from warrantless intrusion by government officers"); see also id. at 180 n. 11 ("the term 'open fields' may include any unoccupied or undeveloped area outside of the curtilage"; the term includes, e.g., "a thickly wooded area"). Thus, the officers' presence in the immediate vicinity of the greenhouse was lawful.
 
 
 23
 The only remaining possible question is the legality of the officers' observation of the interior of the greenhouse through a hole in the wall. Because the officers were legitimately in the area of the greenhouse, and they simply observed, but did not seize, the marijuana plants at that time, their observation did not violate the Fourth Amendment. See Texas v. Brown, 460 U.S. 730, 738 n. 4 (1983) (plurality opinion) ("an officer's mere observation of an item left in plain view ... generally involves no Fourth Amendment search"); id. at 739-40 (police officer's peering into car, even with aid of flashlight, is permissible).
 
 
 24
 AFFIRMED.
 
 
 
 *
 This order and judgment has no precedential value and shall not be cited, or used by any court within the Tenth Circuit, except for purposes of establishing the doctrines of the law of the case, res judicata, or collateral estoppel. 10th Cir.R. 36.3