**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Piedad BARAJAS–AVALOS, aka**
**Piedad Barajas–Avaslos,**
**Defendant–Appellant.**

**No. 02–30301.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 3, 2003.

Filed March 10, 2004.

Amended July 26, 2004.

James G. Rice, Portland, OR, for the defendant-appellant.

Fred N. Weinhouse and Michael J. Brown, Assistant United States Attorneys, Portland, OR, for the plaintiff-appellee.

Before ALARCÓN, FERGUSON, and RAWLINSON, Circuit Judges.

Opinion by Judge ALARCÓN; Partial Dissent by Judge FERGUSON.

## ORDER

The court's opinion, filed March 10, 2004 [359 F.3d 1204], is amended as follows:

The final sentence of the second full paragraph on slip op. 2878 [359 F.3d at 1213] that reads, "In the instant matter, the officers did not enter the trailer or use a device to explore its interior," is deleted.

The two paragraphs on slip op. 2879–80 [359 F.3d at 1213–14] that read:

We agree with Mr. Barajas–Avalos that "there is no Fourth Amendment rule that provides for protection only for traditionally constructed houses." Appellant's Opening Brief at 15. The cases cited in support of this proposition, however, each involved a warrantless entry into the *interior* of a non-traditional structure. In *United States v. Gooch,* 6 F.3d 673 (9th Cir.1993), we held that a warrantless search of the interior of a tent on a public campground violated the Fourth Amendment. *Id.* at 677. In *LaDuke v. Nelson,* 762 F.2d 1318 (9th Cir.1985), we held that "LaDuke's privacy was violated by a flashlight search of his tent." *Id.* at 1332 n. 19. In *United States v. Sandoval,* 200 F.3d 659 (9th Cir.2000), we held that a search of the interior of a makeshift tent violated the appellant's reasonable expectation of privacy even though he was camped illegally on Bureau of Land Management property. *Id.* at 661.

Mr. Barajas–Avalos's reliance on cases holding that a warrantless entry into the interior of a "non-traditional" house violates the Fourth Amendment is misplaced. The record shows that the officers did not enter the travel trailer. An observation of the interior of a protected structure through a window, even when enhanced by a flashlight, does not constitute a search. *United States v. Dunn,* 480 U.S. 294, 298, 304, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987). None of the cases cited by Mr. Barajas–Avalos concerning the searches of the interior of non-traditional structures hold that a guest in a residence or hotel, or an overnight camper, has a protected right to privacy in the open area surrounding his or her sleeping quarters. Mr. Barajas–Avalos has not demonstrated that the officers violated his Fourth Amendment rights by viewing the interior of the travel trailer through a window.

are deleted. The following paragraph shall be substituted in their place and inserted at slip op. 2879:

We agree with Mr. Barajas–Avalos that "there is no Fourth Amendment rule that provides for protection only for traditionally constructed houses." Appellant's Opening Brief at 15. In this matter, however, no prohibited search of the interior of the unoccupied travel trailer occurred. An observation of the interior of a protected structure through a window, even when enhanced by a flashlight, does not constitute a search when the observation is made from an open field or public place. *United States v. Dunn,* 480 U.S. 294, 298, 304, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987). Mr. Barajas–Avalos has not demonstrated that the officers violated his Fourth Amendment rights by viewing the interior of the travel trailer through a window while standing in an open field.

In the paragraph beginning on slip op. 2882 [359 F.3d at 1215] and ending on slip op. 2883 [359 F.3d at 1215], the penultimate sentence reading, "The record is undisputed that the travel trailer did not contain dishes, food, cooking utensils, clothing, bedding, a radio or television, or a hookup to electricity, plumbing, or a source of water," is deleted. It is replaced with the following lines:

It is undisputed that officers were informed by the Portland General Electric Company that it did not provide electrical service to the Willow Tree Farm. Neighbors reported to the police prior to the search that no one lived on the property. The agents did not observe any lights or activity on the property after the daytime visitors left at nightfall.

The final sentence in the first full paragraph on slip op. 2883 [359 F.3d at 1216] stating, "We hold that the curtilage doctrine applies to the area immediately surrounding a home, not to an empty structure used occasionally as sleeping quarters," is deleted.

The second full paragraph on slip op. 2883 [359 F.3d at 1216], which reads:

> Because Mr. Barajas–Avalos has failed to demonstrate that the travel trailer on the Willow Tree Farm was used as a home within the definition set forth in *Hester,* the natural clearing surrounding it was not protected from trespass by the Fourth Amendment. Therefore, we hold that the district court did not err in issuing the search warrants based, in part, on the observations of the officers after trespassing on the Willow Tree Farm.

is deleted and replaced with:

> The totality of the circumstances related by the officers, based on their observations from the open field surrounding the travel trailer, were sufficient to support an inference that the travel trailer was not used as a home. Therefore, the natural clearing surrounding it was not protected from trespass by the Fourth Amendment. The district court did not err in issuing the search warrants based, in part, on the observations of the officers while on the open field surrounding the travel trailer, after trespassing on the Willow Tree Farm.

With these amendments, Judge Alarcón and Judge Rawlin son vote to deny the petition for rehearing.

Judge Ferguson votes to grant the petition for rehearing.

Judge Rawlinson has voted to deny the petition for rehearing en banc.

Judge Alarcón recommends that the petition for rehearing en banc be denied.

Judge Ferguson recommends that the petition for rehearing en banc be granted.

The full court has been advised of the petition for rehearing en banc. No judge has requested a vote on whether to rehear the matter en banc. Fed. R.App. P. 35.

The petition for rehearing and the petition for rehearing en banc are DENIED.

### ORDER

The dissent, filed with the majority opinion on March 10, 2004 [359 F.3d 1204], is amended as follows:

The phrase "concurring in part and" on the first line of slip op. 2890 [359 F.3d at 1219] is deleted.

The portion of the first paragraph on slip op. 2890 [359 F.3d at 1219] reading "This case addresses the issue of whether the legitimacy of a government search may depend upon the results of that search. Because the Fourth Amendment prohibits such a rule," is deleted.

The twelve paragraphs, with their accompanying footnotes, on slip op. 2890–93 [359 F.3d at 1219–21], that read:

> The majority opinion correctly notes that individuals have no legitimate expectation of privacy in "open fields," with the exception of "the area immediately surrounding the home," i.e., the home's curtilage. *Oliver v. United States,* 466 U.S. 170, 178, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984).

The majority also correctly concludes that the trailer on the Willow Tree Farm property was not a home. The federal agents who searched the trailer found no food provisions, no dishes or utensils, and no cooking appliances inside. There were no sheets, blankets, pillows, or sleeping bags on the beds. In short, there was nothing within the trailer to indicate that it was being used at the time for a home.

Given that the trailer was not a home, the majority says, "the natural clearing surrounding it was not protected." They claim that federal agents had committed no Fourth Amendment violation because the clearing, including the area immediately adjacent to the trailer, was "open field" and not "curtilage" to a home.

However, the federal agents investigating the Willow Tree Farm property were not able to obtain this information about the interior of the trailer until they stood immediately next to the trailer and peered through a window with a flashlight. Before looking through the window, the agents did not know what they would find.

The majority has now decreed in this Circuit that when the validity of a search is in question, it is permissible to place the cart before the horse. If the results of the flashlight search *had* shown that the trailer was a home, then the area immediately surrounding the structure would have qualified as curtilage for the purposes of Fourth Amend-

ment analysis.[1] Consequently, peering through the window would have been a Fourth Amendment violation because the officers who did so would have been present in the curtilage of a home without a search warrant.

For us to ratify the flashlight search in this case because the results of the search proved that the structure in question was not a home is to say that the presence or absence of a Fourth Amendment violation depends on what government agents find after looking through the window of a structure and not before.

This is the problem presented by the government's action in this case, and it is a significant one. The majority's opinion eliminates the problem by holding that "non-traditional structures," such as those inhabited by "a guest in a residence or hotel, or an overnight camper," have no curtilage, and such inhabitants have no "protected right to privacy in the open area surrounding his or her sleeping quarters." In the majority's view, then, the Fourth Amendment only prohibits the police from peering through the windows of homes which are "traditional structures." On this view, government agents may look through the windows of campers, trailers, tents, and similar living spaces as much as they please without search warrants.

Under the majority's holding, officials wishing to inspect the interior of a home

---

1. Determination of the extent of a curtilage area requires the four-factor analysis described in *United States v. Dunn*, 480 U.S. 294, 301, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987). As the majority notes, in such cases courts are required to evaluate: "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation." *Id.* While these factors suggest that the curtilage of the trailer (had it been used as a home) would likely have encompassed the entire natural clearing in which the trailer was situated, at the very least, the land immediately adjacent to the trailer's windows would have been protected as curtilage from government intrusion.

through a window without a search warrant need only determine whether the structure is a "traditional" or "non-traditional" house. If the structure is traditional, the area around it may be curtilage and protected from government intrusion. If it is non-traditional, the area around it has no such protection (regardless of any efforts made by the inhabitants to prevent public observation) and agents are free to peer through the windows at any time without a warrant.

This "solution" to the problem is intolerable. If government agents cannot stand outside a traditional house in the suburbs and peer through the window without a search warrant, they should not be able to do so with a non-traditional structure that may serve as someone's home, such as a trailer. As we stated in *LaDuke v. Nelson,* 762 F.2d 1318, 1326 n. 11 (9th Cir.1985), "the Fourth Amendment does not permit [a government agency] to differentiate on a per se basis in the privacy accorded different stocks of housing."

The majority claims to agree that "there is no Fourth Amendment rule that provides for protection only for traditionally constructed houses" but contends that this principle has only been applied in cases which are distinguishable from the facts here. For instance, the majority says, *LaDuke* "involved a warrantless entry into the *interior* of a non-traditional structure" (emphasis in majority opinion) because "LaDuke's privacy was violated by a flashlight search of his tent." This reading of *LaDuke* ignores our finding in that case

that "[t]he record . . . contains incidents in which Border Patrol agents forcibly intruded, *either* physically *or* with a flashlight, into the housing units." 762 F.2d at 1327–28 (emphasis added). We made it clear that both behaviors qualified as Fourth Amendment violations: "LaDuke's privacy was violated by a flashlight search of his tent *and* a physical trespass while the Garcias' privacy was violated *only* through trespass." *Id.* at 1332 n. 19 [2] (emphasis added).

It is difficult to see how the flashlight searches in *LaDuke* were materially different from the flashlight search conducted here, especially since our *LaDuke* footnote references a deposition describing "lights shined through windows." *Id.* The majority's holding in this case suggests that, because tents such as the one occupied by the plaintiffs in *LaDuke* are non-traditional homes, government agents with flashlights may now peer through the tent windows at will.

Trailers, campers, tents, and other non-traditional structures typically used as (temporary or permanent) residences are entitled to the same Fourth Amendment protections as traditional houses, and an inhabitant of a non-traditional home has a protected right to privacy in the area surrounding his or her sleeping quarters.[3] The concept of curtilage would only be irrelevant where government agents were able to conclusively establish, *without* first peering through the window, that the structure in question (whether a traditional or a nontraditional dwelling-place) was not being used as a home. Because the government

---

2. The text to which the footnote is attached reads: "The minor differences in which the representative's Fourth Amendment rights were violated does not render their claims atypical of those of the class."

3. The extent of the protected area, as with all such "curtilage questions," would be resolved with reference to the four factors outlined in *Dunn,* 480 U.S. at 301, 107 S.Ct. 1134.

would not have been able to do so in this case, I would hold that the District Court erred to the extent that its refusal to grant Barajas–Avalos's motion to suppress was based on observations made by the government agents while peering through the trailer's windows. Consequently, I dissent from Parts III and IV of the majority opinion.

are deleted. The following seven paragraphs and the accompanying footnotes shall be substituted in their place and inserted at slip op. 2890:

The majority holds that the government agents were permitted to infer that the trailer was not used as a home [1] from three facts: (1) the Portland General Electric Company did not provide electrical service; (2) the officers did not observe anyone spending the night in the trailer when they observed the property approximately ten or eleven times in the morning or evening hours; and (3) neighbors reported that no one lived on the property (this fact is a misstatement of the evidence).

The fact is, there are people in this country who *do* live without electricity. The U.S. Department of Energy calculates that 1.4% of U.S. households either do not pay for or have no access to electricity.[2] Energy Info. Admin., Office of Coal, Nuclear, Electric and Alternate Fuels, U.S. Dept. of Energy, Energy Consumption and Renewable Energy

Development Potential on Indian Lands ix, 3 (2000), http://www.eia.doe.gov/cneaf/solar.renewables/ilands/ilands_sum .html. I cannot join an opinion that suggests that a house is not a "home," with all the constitutional protections that status carries, because it lacks an electricity supply. Moreover, here, the fact that the Portland General Electric Company did not officially provide service to the trailer did not mean that it was not available; Barajas–Avalos's brother testified that "[t]here is electricity on the telephone pole and we used wire to connect it to the trailer."

I also cannot say that a house is not entitled to full Fourth Amendment protections because residence in it is not continuous. Both migrant farm workers and wealthy people with second homes in Hawaii (who—for very different reasons—would spend one season in one house and the next season in another) have the same privacy rights in and around their residences as people with only one home. *See LaDuke v. Nelson,* 762 F.2d 1318 (9th Cir.1985) (holding that Border Patrol agents violated the Fourth Amendment by searching migrant farm housing units without the occupants' consent). It is not enough to say that a house is unoccupied now, or has been unoccupied lately; houses do not acquire the legal status of barns or warehouses during the temporary ab-

1. Because of this inference, according to the majority, the agents could treat the area around the trailer as "open field," rather than as the curtilage of a home, and thus did not need a warrant to peer into the trailer through a window with a flashlight.

2. The U.S. Department of Housing and Urban Development has also found that many Americans live without basic services. A recent HUD report indicates that, in 1997, over a

million renter households occupied "severely inadequate" housing units and 725,000 owner households did so. Office of Policy Dev. and Research, U.S. Dept. of Hous. and Urban Dev., Rental Housing Assistance—The Worsening Crisis: A Report to Congress on Worst Case Housing Needs, app. at A–2 (2000), http://www.huduser.org/publications/affhsg/worstcase00.html. In the report, a unit was considered to be severely inadequate if it had severe problems in its plumbing, heating,

sence of their owners. This is true even where the absence is extended, so long as the property has not been abandoned. *Cf. United States v. Wilson,* 472 F.2d 901 (9th Cir.1972) (holding that a tenant who departed the property, having left the door open and the rent unpaid, did not have standing to object to a search of the abandoned premises).

Finally, the majority states that Barajas–Avalos's neighbors told the police that no one lived on the property. In fact, Agent Poikey testified that the neighbors "said they had no knowledge of anyone living there." Given that the housing unit in question was surrounded on all sides by vegetation and trees on a thirty-acre parcel of rural land, it is hardly revealing that the neighbors had no knowledge of anyone living in the trailer. I would therefore hold that the government had no information by which it could legitimately have concluded that the trailer was not a home subject to all of the privacy protections afforded homes by the Fourth Amendment.

Additionally, I am concerned that portions of the majority opinion may be understood as suggesting that our Fourth Amendment analysis of curtilage might apply in some different manner to what the majority terms a "dwelling house" than to "temporary sleeping quarters, whether in a hotel room, a trailer, or in a tent in a public area."[3] This cannot be correct, as it would directly contradict our rule in *LaDuke v. Nelson,* 762 F.2d at 1326 n. 11, that "the Fourth Amendment does not permit [a government agency] to differentiate on a per se basis in the privacy accorded

different stocks of housing." *See also Eng Fung Jem v. United States,* 281 F.2d 803, 805 (9th Cir.1960) ("The transience of appellant's stay in the room does not dilute the force of constitutional protection.... The right to privacy must be accorded with equal vigor both to transient hotel guests and to occupants of private, permanent dwellings.").

*LaDuke* held that Border Patrol searches of migrant farm housing units required the consent of the occupants. 762 F.2d at 1327–28. Some of the searches held unconstitutional were flashlight searches, as is the case here, and not physical intrusions of the interior of the units. *Id.* at 1327–28, 1332 n. 19. There is no reason to suppose that we meant to except curtilage from our statement regarding the equal level of "privacy accorded different stocks of housing," since this area of Fourth Amendment analysis is necessarily implicated when a home is approached by government agents but not entered.

For all of these reasons, I dissent from Parts III and IV of the majority opinion.

## OPINION

ALARCÓN, Circuit Judge.

Piedad Barajas–Avalos was convicted of conspiracy to manufacture methamphetamine and attempting to manufacture and manufacturing methamphetamine in violation of federal law. He was sentenced to serve concurrent sentences of imprisonment for 360 months.

He seeks reversal of the judgment of conviction on the ground that the court

---

electrical system, upkeep, or hallways. *Id.* at A–20, A–28.

**3.** The majority appears to assume that every " 'non-traditional' house, such as a travel trailer," is a place "in which persons occasionally spend the night." This is, of course,

not correct, as many people do reside in trailers (as well as in other non-traditional housing units) for long stretches of time. For instance, Barajas–Avalos's brother testified that he lived in the trailer at issue in this case from September to December 1993.

erred in denying his motion to suppress the evidence seized pursuant to a search warrant. Mr. Barajas–Avalos contends that the facts relied upon by the magistrate judge in issuing the warrant were derived from earlier observations made by law enforcement officers by means of an unwarranted trespass onto his thirty-acre parcel of rural land and the natural clearing surrounding his travel trailer.

Mr. Barajas–Avalos also challenges the district court's sentencing decision. He contends that the court erred in denying his motion for a downward departure. He also asserts that the sentence imposed by the court is cruel and unusual punishment because he is not a recidivist felon.

We affirm the judgment of conviction because we conclude that probable cause existed for the issuance of the search warrant. We dismiss the portion of the appeal from the district court's denial of a downward departure for want of appellate jurisdiction to review the order. We affirm the sentence of 360 months because we conclude it was not grossly disproportionate to the crimes committed by Mr. Barajas–Avalos.

## I

Detective Lenard C. Olsen of the Oregon State Police filed an affidavit in support of his request to search Mr. Barajas–Avalos's two-story single-family dwelling located at 14280 Northwest Tradewinds Street in Portland, Oregon, a thirty-acre parcel of land located southeast of the intersection of Soda Springs Road and Potts Road, Gales Creek, Oregon (the "Willow Tree Farm"), and a twelve-foot travel trailer and a Quonset style metal-framed structure located on the thirty-acre parcel.

Detective Olsen's affidavit set forth the following facts. He had been employed continuously with the narcotics division of the Oregon State Police since August 1988. During that time, he participated in more than 300 cases involving the manufacture, possession, and distribution of controlled substances. He also worked in an undercover capacity to infiltrate organizations involved in the possession, distribution, and manufacture of methamphetamine to gain information. He attended a Drug Enforcement Administration ("DEA") forty-hour basic clandestine laboratory investigator school in 1986 and 1995. He also attended the DEA forty-hour lab site safety officer's school in Quantico, Virginia. He has attended numerous classes and seminars designed to acquaint and train law enforcement officers with the methods used by organizations to manufacture controlled substances illegally.

Beginning in April 1999, Detective Olsen and DEA Special Agent Jeffrey Poikey ("Special Agent Poikey") initiated an investigation of an organization ("the Organization") believed to be manufacturing large quantities of methamphetamine in the Portland, Oregon area. The Organization consisted of His-panic individuals who operated large "Mexican National" style methamphetamine laboratories. These laboratories consist of multiple large reaction vessels capable of producing fifty or more pounds of finished methamphetamine in one process. The process involves the use of pseudoephedrine, iodine, and red phosphorous. Methyl–Sulfonyl–Methane ("MSM") is used as a cutting agent.

On June 29, 1999, DEA agents working in conjunction with the Westside Interagency Narcotics Team seized twenty-two pounds of methamphetamine at a large laboratory in a residence in Hillsboro, Oregon. This laboratory was identified as belonging to the Organization through cell phone toll records, fingerprints, and statements from persons in custody.

Mr. Barajas–Avalos was identified by "cooperating defendants" as being a member of the Organization. His involvement was confirmed by DEA agents through analysis of phone records establishing that Mr. Barajas–Avalos communicated with individuals under investigation by telephone.

On January 24, 2000, law enforcement officers seized thirteen pounds of methamphetamine at a large laboratory located in a residence in Tillamook, Oregon. This laboratory was also identified as belonging to the Organization through cell phone records, fingerprints and information from arrestees.

On March 23, 2000, near a fence on Soda Springs Road, on the southwest corner of the Willow Tree Farm, Washington County Sheriff's Office deputies recovered 2,322 empty pseudoephedrine bottles with the bottoms cut open. This property was subsequently determined to belong to Mr. Barajas–Avalos.

Detective Olsen alleged that pseudoephedrine is a precursor chemical used in the production of methamphetamine. He also stated in his affidavit that it is common practice that persons who are involved with manufacturing methamphetamine often use a utility knife to cut open the bottoms of the bottles. The empty bottles were processed for latent fingerprints by the Washington County Forensic Laboratory. Two fingerprints were identified as belonging to members of the Organization.

On April 24, 2000, Mr. Barajas–Avalos was observed by DEA surveillance purchasing sixteen pounds of MSM, a cutting agent for methamphetamine. Laboratory tests of the methamphetamine seized on January 24, 2000 at the Organization's Tillamook, Oregon, methamphetamine laboratory showed that MSM was used as the cutting agent.

On June 12, 2000, Mr. Barajas–Avalos was observed by a DEA surveillance team purchasing twenty-five pounds of MSM.

In July 2000, a "cooperating defendant" informed Special Agent Poikey that Mr. Barajas–Avalos owned a ranch located west of Forest Grove, Oregon. The informer stated that the ranch was used by the Organization as a cook location for methamphetamine. Special Agent Poikey was told that the Organization paid Mr. Barajas–Avalos $15,000 for allowing them to use the ranch for the manufacture of methamphetamine.

On July 7, 2000, DEA agents determined that Mr. Barajas–Avalos was a part owner of the Willow Tree Farm on Soda Springs Road. The 2,322 empty pseudoephedrine bottles found on March 23, 2000 had been found next to the fence in the southwest corner of the Willow Tree Farm.

On September 11, 2000, Mr. Barajas–Avalos was observed by a DEA surveillance team purchasing another twenty-five pounds of MSM.

Also in September 2000, Detective Olsen and DEA Agent Poikey began conducting a surveillance of the Willow Tree Farm. On September 19, 2000, they observed a black Ford pickup truck without a vehicle license plate parked on the Willow Tree Farm grounds. The officers followed the pickup truck to Forest Grove, Oregon. The vehicle was stopped by Forest Grove Police Officer Anthony Silva.

Officer Silva informed Special Agent Poikey that he stopped the pickup truck for failing to display a vehicle license plate. Mr. Barajas–Avalos was a passenger in the Ford pickup truck. He told Officer Silva that he resided at 14280 Northwest Tradewinds, Portland, Oregon. Mr. Barajas–Avalos stated that he was the owner of the truck.

On September 21, 2000, Detective Olsen and Special Agent Poikey entered the Willow Tree Farm without a warrant or consent from Mr. Barajas–Avalos or the other co-owners. On the southeast corner of the Willow Tree Farm, they observed a twelve-foot travel trailer and a Quonset style metal-framed structure ("Quonset hut") covered with a silver vinyl covering, and a pickup truck with a canopy. Detective Olsen observed, through a window in the canopy, two large plastic trash containers, two blender boxes, a can of acetone, a propane burner, discarded plastic gloves, paper towels, duct tape, and a twenty-five pound pail labeled MSM in the bed of the pickup truck. Detective Olsen knew from his training and experience that these items were used in the manufacture of methamphetamine. Next to the pickup truck, the officers saw two "separatory vessels" with valves, lengths of rubber tubing, and containers of sodium hypochloride solution. After walking into the Quonset hut, the agents saw a three-foot stick with a red stain on one end. Detective Olsen knew from his experience that red phosphorus was an ingredient used in the manufacture of methamphetamine.

Detective Olsen observed four discarded glass lids that were approximately eight inches in diameter next to the travel trailer. These lids were similar to lids he had seized from the Tillamook and Hillsboro laboratories. Detective Olsen learned that such lids were used to cover electric deep fryers. Electric deep fryers are used to evaporate a liquid pseudoephedrine mixture into solid pseudoephedrine hydrochloride, a necessary ingredient in the manufacture of methamphetamine.

On October 10, 2000, Detective Olsen and Special Agent Poikey observed Mr. Barajas–Avalos's black pickup truck parked on the Willow Tree Farm. This same pickup truck had been observed by Special Agent Poikey at Mr. Barajas–Avalos's residence at 14280 Northwest Tradewinds, Portland, Oregon.

As Detective Olsen approached the southeast corner of the property, he heard noises coming from the Quonset hut that sounded like the movement of pots and pans. The officers continued their surveillance until the black pickup truck departed. Special Agent Poikey observed Mr. Barajas–Avalos arrive at his 14280 Northwest Tradewinds, Portland, Oregon residence at 2:40 a.m. on the following morning. Thereafter, the interior lights of Mr. Barajas–Avalos's residence were extinguished.

On October 11, 2000, Detective Olsen submitted an affidavit containing the foregoing facts to United States Magistrate Judge Janice M. Stewart. Magistrate Judge Stewart issued warrants authorizing searches of the Willow Tree Farm, Mr. Barajas–Avalos's Portland, Oregon residence, and his black Ford pickup truck. On October 20, 2000, Magistrate Judge Stewart authorized the search of a storage locker in Beaverton, Oregon, registered to Mr. Barajas–Avalos. Searches were conducted pursuant to these warrants.

## II

Mr. Barajas–Avalos filed a motion to suppress all of the evidence seized pursuant to the search warrants. The motion states:

The evidence at the hearing on this motion will show that federal agents established probable cause to obtain a search warrant from a magistrate on October 11, 2000 only by trespassing onto the curtilage of defendant's property in violation of the Fourth Amendment.

The testimony presented by the Government at the hearing on the motion to

suppress disclosed additional facts regarding the Willow Tree Farm and the officer's information and observations prior to obtaining the search warrants. On July 5, 2000, Special Agent Poikey was informed by a "cooperating defendant" that a ranch on Soda Springs Road was owned by Mr. Barajas–Avalos and that it was used for the manufacture of methamphetamine. This report was independently corroborated by information that the officers had previously received regarding the Organization, the purchase by Mr. Barajas–Avalos of large quantities of MSM, and the discovery of 2,322 empty pseudoephedrine bottles adjacent to the southwest corner of the Willow Tree Farm. Special Agent Poikey learned that Mr. Barajas–Avalos was a co-owner of the Willow Tree Farm by examining tax assessment records. The property was zoned as farmland.

The Willow Tree Farm did not have a residential address. Instead, it was identified in the tax assessor's office by its parcel number. The officers were informed by the Portland General Electric Company that it did not provide electrical service to the Willow Tree Farm.

Detective Olsen and Special Agent Poikey began their surveillance of the Willow Tree Farm in early September 2000. Initially they parked their vehicles in a wooded area on adjoining land, outside the western boundary of the Willow Tree Farm. From this vantage point, they could observe the gate and the driveway to the Willow Tree Farm. Their view of the Willow Tree Farm was partially blocked, however, by ten acres of curly willow trees. Neighbors on the adjacent properties stated to the officers that they had no knowledge of anyone living on the Willow Tree Farm property. They reported that persons would come to the property during the day and leave at night.

The officers obtained permission from a neighbor to conduct surveillance from an adjoining property on the east side of the Willow Tree Farm. From that location, they observed a travel trailer, a Quonset hut, and some abandoned vehicles. The officers also saw vehicles arrive in the morning and enter through a secured gate. The same vehicles left approximately twenty to thirty minutes after dark. The gate was secured each time the cars left the Willow Tree Farm.

The Willow Tree Farm had a gravel road that had three large gates. The entrance was posted with "No Trespassing" signs. The property was fenced with barbed wire.

After conducting a surveillance from a neighbor's land ten or eleven times, the officers concluded that no one resided on the property. During this time period, the officers did not see any lights or activity on the property after the vehicles left at nightfall. After consulting with members of the United States Attorney's Office, the officers entered the Willow Tree Farm from the west at 6:30 a.m. on September 20, 2000. They observed a travel trailer and a Quonset hut. Both were dark. They left the property after being confronted by an unleashed dog. A second dog joined in barking at the departing officers. No person appeared on the property in response to the barking of the dogs.

On September 21, 2000, the officers reentered the Willow Tree Farm and approached the travel trailer, the Quonset hut, and the abandoned vehicles. On this occasion they observed the items described in Detective Olsen's affidavit as methamphetamine cooking materials.

Special Agent Poikey and Detective Olsen looked inside the travel trailer through its windows. They saw two twenty-pound propane tanks on the floor of the travel

trailer. The countertops appeared to be empty. They saw four-inch thick foam pads, but no bedding or pillows were visible.

There were no electric power lines attached to the travel trailer. It did not appear to be connected to a septic system of any kind. The travel trailer did not appear to contain any other signs of occupancy, such as: a source of running water, clothing, food, a television set, or a radio. There were no operable vehicles in the natural clearing surrounding the travel trailer.

On September 26, 2000 at 6:30 a.m., Special Agent Poikey reentered the Willow Tree Farm with a video camera. He videotaped the travel trailer, the Quonset hut, and the items described in the affidavit for the search warrants.

Between September, 26, 2000 and October 10, 2000, the officers continued their surveillance of the Willow Tree Farm from adjoining properties. On October 10, 2000, the officers saw and heard sounds that were consistent with the banging of pots and pans. At around 7:00 p.m., two vehicles left the property. Mr. Barajas–Avalos's vehicle was followed to a bar.

While Mr. Barajas–Avalos was in the bar under surveillance by other officers, Special Agent Poikey and Detective Olsen reentered the Willow Tree Farm at 11:00 p.m. The tarp that covered the entry to the Quonset hut was propped open by a 2 × 6 board. They observed propane burners inside the Quonset hut with pots and pans on them. They also saw a large plastic container that contained a solvent and a white sludge or solution. After making these observations, Detective Olsen prepared an affidavit and requested that Magistrate Judge Stewart issue search warrants.

DEA Special Agent Shawn Alexander testified that he was assigned to surveil the Willow Tree Farm from an adjoining property on October 11, 2000. Prior to the arrival of the officers with the search warrants, Special Agent Alexander smelled an odor of a burning chemical, and saw a small amount of smoke. Special Agent Alexander testified that based on his training and experience the odor was similar to that which emanates from a methamphetamine laboratory.

Mr. Barajas–Avalos presented witnesses on March 6, 2001, in support of his motion to suppress the evidence seized pursuant to the search warrants. Ramone Barajas testified that he is the father of Mr. Barajas–Avalos. He and his two sons were co-owners of the Willow Tree Farm. He testified that he slept in the travel trailer many times. He stayed in the travel trailer "to watch over things" and "to get up in the morning and work there." In addition, he stayed in the travel trailer at times in the summer to protect the curly willow trees from elk. Mr. Barajas testified that he had last slept in the travel trailer during the preceding summer. Mr. Barajas also testified that outdoor parties were conducted in the natural clearing where the travel trailer was parked. On cross-examination, Mr. Barajas testified that no one lived on the thirty-acre parcel permanently, "[w]e just stay there."

Enrique Barajas testified that he is Mr. Barajas–Avalos's brother. He stated that he used the travel trailer as his residence between September 15, 1993 and December 26 of the same year.

DEA Special Agent Thomas Velez testified on behalf of the prosecution. He stated that he assisted in executing the search warrant at the Willow Tree Farm. He conducted a search of the travel trailer on October 12, 2000. The travel trailer appeared "dirty" and "not lived in." It did

not contain any personal effects, clothing, bedding, food, or an electrical connection. There were two small, thin, foam rubber mattress pads in the travel trailer. In lifting one of the mattresses, Special Agent Velez discovered a field mouse. It had made a nest by chewing out foam rubber from under the mattress.

Mr. Barajas–Avalos argued, in support of his motion to suppress, that the travel trailer was a "house" protected by the Fourth Amendment from unreasonable searches and seizures because it contained two mattresses and had been used by his family members as sleeping quarters. He contended that the natural clearing immediately surrounding the travel trailer was the curtilage of his "house," protected from warrantless searches and observations by the Fourth Amendment.

The district court denied the motion to suppress. It held that the travel trailer was not a residence because it did not "harbor those intimate activities associated with domestic life and the privacies of home." The district court concluded that since the travel trailer was not a home, the natural clearing surrounding it was not a curtilage protected against trespass by law enforcement officers.

Mr. Barajas–Avalos was convicted as charged in the indictment. He was sentenced to 360 months in prison followed by five years of supervised release. The district court denied his request for a downward departure.

Mr. Barajas–Avalos has timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

### III

Mr. Barajas–Avalos contends that the officers violated his Fourth Amendment right to privacy by entering the natural clearing, in which the travel trailer was parked, without obtaining a search warrant. He argues that because "the trailer was frequently used to sleep persons, including the defendant, both for personal reasons, and to try to protect the curly willow from being eaten by local elk," the natural clearing around it was a curtilage, constitutionally protected against trespass or entry without a search warrant. Appellant's Opening Brief at 4. Because the officers entered the natural clearing without a warrant, Mr. Barajas–Avalos maintains that the observations of the officers cannot be considered in determining whether Detective Olsen's affidavit set forth sufficient facts to justify the issuance of a search warrant. Mr. Barajas–Avalos also asserts that the affidavit does not set forth sufficient facts to establish probable cause if the observations of the officers during their trespass onto the Willow Tree Farm are excised.

 We review de novo the question whether an area of land is protected under the Fourth Amendment as the curtilage of a dwelling house. *United States v. Johnson*, 256 F.3d 895, 909 n. 1 (9th Cir. 2001)(en banc). We also review independently the denial of a motion to suppress. *United States v. Enslin*, 315 F.3d 1205, 1209 (9th Cir.2003).

 We are mindful that "evidence which is obtained as a direct result of an illegal search and seizure may not be used to establish probable cause for a subsequent search." *United States v. Wanless*, 882 F.2d 1459, 1465 (9th Cir.1989) (citations omitted). When an affidavit contains evidence illegally obtained, "[a] reviewing court should excise the tainted evidence and determine whether the remaining, untainted evidence would provide a neutral magistrate with probable cause to issue a warrant." *United States v. Vasey*, 834 F.2d 782, 788 (9th Cir.1987) (citation omitted).

■ Mr. Barajas–Avalos's argument confuses and conflates two discrete Fourth Amendment protections. He has failed to demonstrate that he is entitled to a reversal under either theory. It is quite true that a person has a right to privacy in his dwelling house, or temporary sleeping quarters, whether in a hotel room, a trailer, or in a tent in a public area, or on government land not open to the public for overnight camping. It is also clearly established that the curtilage surrounding a person's dwelling house is protected from an unwarranted entry. The travel trailer and the natural clearing area surrounding it on the Willow Tree Farm did not fit in either protected category on the dates that the officers entered the Willow Tree Farm without a search warrant.

The right of a person to privacy within the enclosed interior of a dwelling house is expressly protected from governmental intrusion by the Fourth Amendment. The Fourth Amendment provides in pertinent part the "right of the people to be secure in their ... houses ... against unreasonable searches and seizures shall not be violated...." *U.S. Const.* amend. IV.

In *Dow Chemical Co. v. United States,* 476 U.S. 227, 106 S.Ct. 1819, 90 L.Ed.2d 226 (1986), the Court held that a person "plainly has a reasonable, legitimate, and objective expectation of privacy *within the interior of ... covered buildings,* and it is equally clear that expectation is one society is prepared to observe." *Id.* at 236, 106 S.Ct. 1819 (emphasis added) (citation omitted). In *Kyllo v. United States,* 533 U.S. 27, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001) the Court extended the concept of an objective expectation of privacy to bar the unwarranted use of thermal imagers to detect infrared radiation to scan the interior of a residence through its walls to determine whether it contained high intensity lamps used to grow marijuana indoors.

*Id.* at 31–40, 121 S.Ct. 2038. The Court held that "[w]here as here, the Government uses a device that is not in general public use, to explore details of the home that would previously have been unknowable without physical intrusion, the surveillance is a 'search' and is presumptively unreasonable without a warrant." *Id.* at 40, 121 S.Ct. 2038.

In *United States v. Broadhurst,* 805 F.2d 849 (9th Cir.1986), we held that "[i]t is clear that one may have a legally sufficient interest in a place other than her own house so as to extend Fourth Amendment protection from unreasonable searches and seizures in that place." *Id.* at 851 (citations omitted). In *Broadhurst,* we ruled that a person has standing to challenge an alleged search if he or she has "joint control and supervision" of the place. *Id.* at 852. We also concluded, however, that overflights conducted by officers of a greenhouse situated 125 yards from a two-story residence did not constitute a search requiring a warrant under the Fourth Amendment. *Id.* at 849–50, 856–57.

In *Stoner v. California,* 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964), the Court noted that "[n]o less than a tenant of a house, or the occupant of a room in a boarding house, a guest in a hotel room is entitled to constitutional protection against unreasonable searches and seizures." *Id.* at 490, 84 S.Ct. 889 (citations omitted). In *Minnesota v. Olson,* 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990), the Court held that an overnight guest in a residence had a reasonable expectation of privacy under the protection of the Fourth Amendment. The Court held that the entry into the residence to arrest the respondent without an arrest warrant violated the Fourth Amendment. *Id.* at 96–97, 110 S.Ct. 1684.

■ We agree with Mr. Barajas–Avalos that "there is no Fourth Amendment rule

that provides for protection only for traditionally constructed houses." Appellant's Opening Brief at 15. In this matter, however, no prohibited search of the interior of the unoccupied travel trailer occurred. An observation of the interior of a protected structure through a window, even when enhanced by a flashlight, does not constitute a search when the observation is made from an open field or public place. *United States v. Dunn*, 480 U.S. 294, 298, 304, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987). Mr. Barajas–Avalos has not demonstrated that the officers violated his Fourth Amendment rights by viewing the interior of the travel trailer through a window while standing in an open field.

## IV

■ Mr. Barajas–Avalos further argues that because there is a right to privacy in the interior of a "non-traditional" house, such as a travel trailer, in which persons occasionally spend the night, the open area surrounding a travel trailer is also protected from warrantless entry as the curtilage of the sleeping quarters. He maintains that the incriminating information that resulted from the officers' trespasses on the Willow Tree Farm must be struck from the affidavit. He asserts that without the recitation of the observations made during the trespasses, the affidavit does not contain sufficient facts to demonstrate that probable cause existed for the arrest of Mr. Barajas–Avalos.

In *Hester v. United States*, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924), the Supreme Court held that the right to privacy does not extend to a person's open fields. *Id.* at 59, 44 S.Ct. 445. The Court instructed that "the special protection accorded by the Fourth Amendment to the people in their 'persons, houses, papers, and effects' is not extended to the open fields. The distinction between the latter

and the house is as old as the common law." *Id.* (citation omitted). The Court stated in *Hester* that "even if there had been a trespass," the information obtained by officers who "supposed they were on Hester's land," was not obtained by an illegal search or seizure. *Id.* at 58, 44 S.Ct. 445.

The Supreme Court confirmed the continued vitality of the "open fields" doctrine in *Oliver v. United States*, 466 U.S. 170, 177–178, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984). The Court stated in *Oliver*: "We conclude, as did the Court in deciding *Hester v. United States*, that the government's intrusion upon the open fields is not one of those 'unreasonable searches' proscribed by the text of the Fourth Amendment." *Id.* at 177, 104 S.Ct. 1735.

In *Oliver*, when the officers arrived at Oliver's farm, "they drove past petitioner's house to a locked gate with a 'No Trespassing' sign." *Id.* at 173, 104 S.Ct. 1735. Oliver's marijuana field was "bounded on all sides by woods, fences, and embankments and cannot be seen from any point of public access." *Id.* at 174, 104 S.Ct. 1735. The Court held in *Oliver* that "an individual may not legitimately demand privacy for activities conducted out of doors in fields, except in the area immediately surrounding the home." *Id.* at 178, 104 S.Ct. 1735 (citation omitted).

In *Oliver*, the Court distinguished between the law of trespass and the right of privacy protected by the Fourth Amendment. The Court explained this distinction as follows:

The law of trespass, however, forbids intrusions upon land that the Fourth Amendment would not proscribe. For trespass law extends to instances where the exercise of the right to exclude vindicates no legitimate privacy interest. Thus, in the case of open fields, the general rights of property protected by

the common law of trespass have little or no relevance to the applicability of the Fourth Amendment.

*Id.* at 183–184, 104 S.Ct. 1735.

The Court explained in *Oliver* that "the common law distinguished 'open fields' from the 'curtilage,' the land immediately surrounding and associated with the *home.*" *Id.* at 180, 104 S.Ct. 1735 (emphasis added) (citation omitted). The Court defined the term "curtilage" as "the area to which extends the intimate activity associated with the 'sanctity of a man's *home* and the privacies of life.' " *Id.* at 180, 104 S.Ct. 1735 (quoting *Boyd v. United States,* 116 U.S. 616, 630, 6 S.Ct. 524, 29 L.Ed. 746 (1886)) (emphasis added).

In *United States v. Dunn,* 480 U.S. 294, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987), the Court held:

curtilage questions should be resolved with particular reference to four factors: the proximity of the area claimed to be curtilage to the *home,* whether the area is included within an enclosure surrounding the *home,* the nature of the uses to which the area is put, and the steps taken by the *resident* to protect the area from observation by people passing by.

*Id.* at 301, 107 S.Ct. 1134 (emphasis added) (citations omitted).

The Court in *Dunn,* cautioned that:

these factors are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration—whether the area in question is so intimately tied to the *home* itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection.

*Id.* at 301, 107 S.Ct. 1134 (emphasis added).

In applying these factors to the instant matter, the dispositive question in deter-

mining whether the natural clearing was protected from a warrantless entry is whether the travel trailer was a "home." We must decide whether the travel trailer "harbor[ed] those intimate activities associated with domestic life and the privacies of the home." *Dunn,* 480 U.S. at 301 n. 4, 107 S.Ct. 1134. We note at the outset of our analysis that there is no evidence that the travel trailer was used as a permanent or temporary home since 1993. It is undisputed that officers were informed by the Portland General Electric Company that it did not provide electrical service to the Willow Tree Farm. Neighbors reported to the police prior to the search that no one lived on the property. The agents did not observe any lights or activity on the property after the daytime visitors left at nightfall. During the time the officers conducted their surveillance of the Willow Tree Farm, no one occupied the travel trailer overnight.

Ramone Barajas testified that he slept in the travel trailer occasionally to work on the Willow Tree Farm and to protect the curly willow trees from elk. This occasional occupancy did not demonstrate that the travel trailer "harbor[ed] those intimate activities associated with domestic life and the privacies of the home." Instead, the record simply shows that since 1993 the travel trailer has been used occasionally by Mr. Barajas as a place to sleep while performing farm chores. It is undisputed that Mr. Barajas–Avalos's residence was at a separate location in Portland, Oregon.

The totality of the circumstances related by the officers, based on their observations from the open field surrounding the travel trailer, were sufficient to support an inference that the travel trailer was not used as a home. Therefore, the natural clearing surrounding it was not protected from trespass by the Fourth Amendment. The district court did not err in issuing the

search warrants based, in part, on the observations of the officers while on the open field surrounding the travel trailer, after trespassing on the Willow Tree Farm.

V

■ In his reply brief, Mr. Barajas–Avalos contends that, if the information obtained by the officers in their trespasses on the Willow Tree Farm is redacted, "[t]he affidavit does not present sufficient facts to uphold the [search] warrant." Appellant's Reply Brief at 3. We disagree. He asserts that the only allegation of direct illegal activity is based on the report of an informant of unknown veracity. We review de novo the question whether probable cause exists after allegedly tainted information has been redacted from an affidavit. *United States v. Huguez–Ibarra*, 954 F.2d 546, 551 (9th Cir.1992).

■ "The mere inclusion of tainted evidence in an affidavit does not, by itself, taint the warrant or the evidence seized pursuant to the warrant." *Vasey*, 834 F.2d at 788 (citation omitted). "A reviewing court should excise the tainted evidence and determine whether the remaining, untainted evidence would provide a neutral magistrate with probable cause to issue a warrant." *Id.* (citation omitted). "An affidavit in support of a search warrant demonstrates probable cause if, under the totality of the circumstances, it reveals a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Celestine*, 324 F.3d 1095, 1102 (9th Cir.2003) (citation omitted).

■ In *Celestine*, we upheld the issuance of a search warrant even though the affidavit did not allege facts regarding the reliability of an unidentified informant. *Id.* The affidavit contained a statement from an informant that marijuana was being grown inside a house that resembled a castle on a specific street. *Id.* at 1098. The affidavit also indicated that the house's electricity usage was twice that of other homes in the neighborhood. Such excess usage occurs when marijuana was being grown within a building. *Id.* The affidavit also contained allegations that a pair of scissors found in the house's trash contained marijuana residue, and that an empty bottle of pH reducer, used in indoor marijuana cultivation, was found in the trash. *Id.* at 1098–99. Finally, an individual seen at the house was also seen purchasing two boxes of grodan cubes and sheets of mylar, items used in indoor plant cultivation. *Id.* at 1099.

This case is analogous to *Celestine*. The affidavit in this case contains sufficient evidence to establish probable cause for the issuance of a warrant without considering the observations made by the officers while trespassing on the Willow Tree Farm.

The facts known to Detective Olsen prior to the trespasses demonstrating probable cause can be summarized as follows:

One. In April 1999, Detective Olsen and DEA Agent Poikey began investigating reports that an Organization was manufacturing methamphetamine in the Portland area.

Two. On June 29, 1999, DEA agents seized twenty-two pounds of methamphetamine at a methamphetamine laboratory located in a residence in Hillsboro, Oregon. This laboratory was identified as belonging to the same Organization through the statement of arrestees, fingerprints and cell phone records.

Three. "Cooperating defendants" informed the officers that Mr. Barajas–Avalos was a member of the Organization.

Four. DEA agents independently confirmed Mr. Barajas–Avalos's involvement in the Organization through telephone records showing that he communicated with other members who were under investigation.

Five. On March 23, 2000, Washington County Sheriff's deputies recovered 2,322 empty pseudoephedrine bottles near a fence on the southwest corner of the Willow Tree Farm.

Six. On April 24, 2000, DEA agents observed Mr. Barajas–Avalos purchasing sixteen pounds of MSM. MSM is a cutting agent for methamphetamine.

Seven. On June 12, 2000, DEA agents observed Mr. Barajas–Avalos purchasing twenty-five pounds of MSM.

Eight. A "cooperating defendant" informed Special Agent Poikey in July 2000, that Mr. Barajas–Avalos owned a ranch west of Forest Grove, Oregon that was used by the Organization as a location to produce methamphetamine.

Nine. On July 7, 2000, DEA agents determined that Mr. Barajas–Avalos was a part owner of the Willow Tree Farm, after examining tax assessment records.

Ten. On September 11, 2000, DEA agents observed Mr. Barajas–Avalos purchasing twenty-five pounds of MSM.

Eleven. On September 19, 2000, Detective Olsen and Special Agent Poikey observed a black Ford pickup truck owned by Mr. Barajas–Avalos on the Willow Tree Farm.

The informant's report that Mr. Barajas–Avalos was using the Willow Tree Farm to manufacture methamphetamine was independently corroborated by the officer's investigation including, *inter alia*, the presence of thousands of empty pseudoephedrine bottles dumped next to the Willow Tree Farm and his purchases on three occasions of a precursor to metham-

phetamine. *See United States v. Bishop*, 264 F.3d 919, 925 (9th Cir.2001) (holding that when a search warrant is based on an informant's tip, the reliability of the information may be demonstrated through independent police corroboration). Thus, the district court did not err in concluding that Detective Olsen's affidavit contained sufficient facts to support the issuance of a search warrant without considering the officers' observations while trespassing on the Willow Tree Farm.

## VI

■ Mr. Barajas–Avalos also contends that the district court erred in failing to grant him a downward departure "based [on] the detriment he suffers in confinement based on his alienage." Appellant's Opening Brief at 5.

■ "A district court's refusal to grant a downward departure is discretionary and free from appellate review." *United States v. Romero*, 293 F.3d 1120, 1126 (9th Cir.2002), *cert. denied*, 537 U.S. 1144, 123 S.Ct. 948, 154 L.Ed.2d 844 (2003) (citation omitted). In this matter, the district court expressly stated "I do have discretion to depart downward on the factors which are urged so well by your attorney." Counsel argued that the court should consider Mr. Barajas–Avalos's age, his education, his steady employment, his family, and his minimal record "in conjunction with … the fact of … alienage, that [he] will not be due that which is available to others who are not going to be deported."

The court considered each of these factors and determined that this case did not fall outside the heartland of other cases involving aliens. We have no jurisdiction to review the court's exercise of its discretion in refusing to depart downwardly based on the combination of factors argued

by counsel, including Mr. Barajas–Avalos's status as a deportable alien.

## VII

 Finally, Mr. Barajas–Avalos maintains that the 360 month sentence imposed by the court must be vacated because it violates his Eighth Amendment right to be free from cruel and unusual punishment. Mr. Barajas–Avalos has never before been convicted of a felony or a crime of violence. He argues that the sentence is extreme and grossly disproportionate. We review de novo the constitutionality of a sentence. *United States v. Patterson*, 292 F.3d 615, 631 (9th Cir. 2002).

 The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." *U.S. Const.* amend. XIII. "In determining whether a sentence violates the Eighth Amendment, [courts] must accord substantial deference to legislative determinations of appropriate punishments." *Patterson*, 292 F.3d at 631 (internal quotations omitted). The Eighth Amendment "forbids ... extreme sentences that are 'grossly disproportionate' to the crime." *Harmelin v. Michigan*, 501 U.S. 957, 1001, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) (Kennedy, J., concurring in part and concurring in the judgment). This narrow proportionality principle applies to noncapital sentences. *Id.* at 997, 111 S.Ct. 2680. "[O]utside the context of capital punishment, successful challenges to the proportionality of particular sentences have been exceedingly rare." *Ewing v. California*, 538 U.S. 11, 123 S.Ct. 1179, 1186, 155 L.Ed.2d 108 (2003) (quoting *Rummel v. Estelle*, 445 U.S. 263, 272, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980)).

In *Harmelin*, the Supreme Court upheld as constitutional a sentence of life in prison without the possibility of parole imposed on a defendant who was a first-time offender convicted of possessing 672 grams of cocaine. 501 U.S. at 961, 994, 111 S.Ct. 2680. In *Hutto v. Davis*, 454 U.S. 370, 370–71, 375, 102 S.Ct. 703, 70 L.Ed.2d 556 (1982), the Court upheld as constitutional a defendant's sentence of two consecutive terms of twenty years in prison for possession with the intent to distribute nine ounces of marijuana and distribution of marijuana. In both cases, the Supreme Court determined that federal courts should be reluctant to review legislatively mandated terms of imprisonment because "the fixing of prison terms for specific crimes ... is 'properly within the province of legislatures, not courts.'" *Harmelin*, 501 U.S. at 998, 111 S.Ct. 2680 (quoting *Rummel v. Estelle*, 445 U.S. at 275–76, 100 S.Ct. 1133); *Hutto*, 454 U.S. at 374, 102 S.Ct. 703. *See also Patterson*, 292 F.3d at 9954 631–32 (holding that a sentence of 188 months of imprisonment was not "grossly disproportionate" to the crime of manufacturing 100 or more marijuana plants, considering the gravity of the offense and the fact that the penalty imposed was both at the minimum of the Guideline range and well below the statutory maximum).

Mr. Barajas–Avalos was sentenced to 360 months of imprisonment for conspiring to manufacture methamphetamine in violation of 21 U.S.C. § 846 and attempting to manufacture and manufacturing methamphetamine in violation of 21 U.S.C. § 841. Based on the amount of a mixture containing methamphetamine attributed to Mr. Barajas–Avalos, the minimum punishment imposed by statute is ten years imprisonment for each offense. 21 U.S.C. § 841(b)(1)(A).

The amount of methamphetamine dictated a base offense level of 38. *See* USSG § 2D1.1(a). The district court granted two enhancements: one for the possession of

firearms in connection with the offense, USSG § 2D1.1(b)(1), and one for obstruction of justice, USSG § 3C1.1, bringing the total offense level to 42. Mr. Barajas–Avalos's criminal history placed him in category I because he had only a single prior misdemeanor conviction. The imprisonment range for an offense level of 42 with a criminal history of category I is 360 months to life. The district court sentenced Mr. Barajas–Avalos at the low end of the guideline range.

Mr. Barajas–Avalos was convicted of serious drug offenses. His sentence was consistent with the Sentencing Guidelines. Mr. Barajas–Avalos's crimes were at least as serious as those committed by the defendants in *Harmelin* and *Hutto*. His sentence was less severe. After reviewing Mr. Barajas–Avalos's sentence de novo, we conclude that it is not grossly disproportionate, nor does it violate the Eighth Amendment's ban on cruel and unusual punishment.

AFFIRMED.

FERGUSON, Circuit Judge, dissenting in part:

I dissent from Parts III, IV, and V of the majority opinion.

The majority holds that the government agents were permitted to infer that the trailer was not used as a home [1] from three facts: (1) the Portland General Electric Company did not provide electrical service;

(2) the officers did not observe anyone spending the night in the trailer when they observed the property approximately ten or eleven times in the morning or evening hours; and (3) neighbors reported that no one lived on the property (this fact is a mistatement of the evidence).

The fact is, there are people in this country who *do* live without electricity. The U.S. Department of Energy calculates that 1.4% of U.S. households either do not pay for or have no access to electricity.[2] Energy Info. Admin., Office of Coal, Nuclear, Electric and Alternate Fuels, U.S. Dept. of Energy, Energy Consumption and Renewable Energy Development Potential on Indian Lands ix, 3 (2000), http://www.eia.doe.gov/cneaf/solar.renewables /ilands/iland_sum.html. I cannot join an opinion that suggests that a house is not a "home," with all the constitutional protections that status carries, because it lacks an electricity supply. Moreover, here, the fact that the Portland General Electric Company did not officially provide service to the trailer did not mean that it was not available; Barajas–Ávalos's brother testified that"[t]here is electricity on the telephone pole and we used wire to connect it to the trailer."

I also cannot say that a house is not entitled to full Fourth Amendment protections because residence in it is not continuous. Both migrant farm workers and wealthy people with second homes in Ha-

---

1. Because of this inference, according to the majority, the agents could treat the area around the trailer as "open field," rather than as the curtilage of a home, and thus did not need a warrant to peer into the trailer through a window with a flashlight.

2. The U.S. Department of Housing and Urban Development has also found that many Americans live without basic services. A recent HUD report indicates that, in 1997, over a

million renter households occupied "severely inadequate" housing units and 725,000 owner households did so. Office of Policy Dev. and Research, U.S. Dept. of Hous. and Urban Dev., Rental Housing Assistance—The Worsening Crisis: A Report to Congress on Worst Case Housing Needs, app. at A–2 (2000), http://www.huduser.org/publications/affhsg/ worstcase00.html. In the report, a unit was considered to be severely inadequate if it had severe problems in its plumbing, heating,

waii (who—for very different reasons—would spend one season in one house and the next season in another) have the same privacy rights in and around their residences as people with only one home. *See LaDuke v. Nelson,* 762 F.2d 1318 (9th Cir.1985) (holding that Border Patrol agents violated the Fourth Amendment by searching migrant farm housing units without the occupants' consent). It is not enough to say that a house is unoccupied now, or has been unoccupied lately; houses do not acquire the legal status of barns or warehouses during the temporary absence of their owners. This is true even where the absence is extended, so long as the property has not been abandoned. *Cf. United States v. Wilson,* 472 F.2d 901 (9th Cir.1972) (holding that a tenant who departed the property, having left the door open and the rent unpaid, did not have standing to object to a search of the abandoned premises).

Finally, the majority states that Barajas–Avalos's neighbors told the police that no one lived on the property. In fact, Agent Poikey testified that the neighbors "said they had no knowledge of anyone living there." Given that the housing unit in question was surrounded on all sides by vegetation and trees on a thirty-acre parcel of rural land, it is hardly revealing that the neighbors had no knowledge of anyone living in the trailer. I would therefore hold that the government had no information by which it could legitimately have concluded that the trailer was not a home subject to all of the privacy protections afforded homes by the Fourth Amendment.

Additionally, I am concerned that portions of the majority opinion may be understood as suggesting that our Fourth Amendment analysis of curtilage might apply in some different manner to what the majority terms a "dwelling house" than to "temporary sleeping quarters, whether in a hotel room, a trailer, or in a tent in a public area."[3] This cannot be correct, as it would directly contradict our rule in *LaDuke v. Nelson,* 762 F.2d at 1326 n. 11, that "the Fourth Amendment does not permit [a government agency] to differentiate on a per se basis in the privacy accorded different stocks of housing." *See also Eng Fung Jem v. United States,* 281 F.2d 803, 805 (9th Cir.1960) ("The transience of appellant's stay in the room does not dilute the force of constitutional protection.... The right to privacy must be accorded with equal vigor both to transient hotel guests and to occupants of private, permanent dwellings.").

*LaDuke* held that Border Patrol searches of migrant farm housing units required the consent of the occupants. 762 F.2d at 1327–28. Some of the searches held unconstitutional were flashlight searches, as is the case here, and not physical intrusions of the interior of the units. *Id.* at 1327–28, 1332 n. 19. There is no reason to suppose that we meant to except curtilage from our statement regarding the equal level of "privacy accorded different stocks of housing," since this area of Fourth Amendment analysis is necessarily implicated when a home is approached by government agents but not entered.

For all of these reasons, I dissent from Parts III and IV of the majority opinion.

---

electrical system, upkeep, or hallways. *Id.* at A–20, A–28.

**3.** The majority appears to assume that every " 'non-traditional' house, such as a travel trailer," is a place "in which persons occasionally spend the night." This is, of course,

not correct, as many people do reside in trailers (as well as in other non-traditional housing units) for long stretches of time. For instance, Barajas–Avalos's brother testified that he lived in the trailer at issue in this case from September to December 1993.

I also dissent from Part V of the majority opinion. Once the observations made by the officers while trespassing on Willow Tree Farm are redacted, the affidavit submitted in support of the search warrant does not contain sufficient evidence to establish probable cause.

The majority's analogy to *United States v. Celestine*, 324 F.3d 1095 (9th Cir.2003), fails. The facts legitimately available to the government in that case pointed far more directly to the presence of illicit drug activity on the property in question than was the case here. As the majority notes, the affidavit in *Celestine* indicated that a pair of scissors containing marijuana residue and an empty bottle of pH reducer (a substance used in indoor marijuana cultivation) were found in the house's trash, the house consumed twice the electricity of neighboring houses (an indication of an indoor drug-growing operation), and an individual was observed driving from the house to a hydroponics store, where the individual purchased items used in indoor plant cultivation. *Id.* at 1098–99. The *Celestine* court held that, taken together, the evidence "establishe[d] an adequate basis to conclude that evidence of drug growing would be found in the house." *Id.* at 1102.

Here, by contrast, there was little to link the evidence of Mr. Barajas–Avalos's involvement in a methamphetamine-manufacturing organization with the Willow Tree Farm property. Aside from the fact that Mr. Barajas–Avalos was a part-owner in the property and a statement by a "cooperating defendant" alleging that methamphetamine was being produced on Mr. Barajas–Avalos's property, the only evidence linking Willow Tree Farm with the production of methamphetamine was the large quantity of empty pseudophedrine bottles dumped on adjacent public land. There was no evidence to indicate, however, that the bottles had originated from the Willow Tree Farm property. Mr. Barajas–Avalos's fingerprints were not found on the bottles, and the bottles were not found among trash known to have originated from Willow Tree Farm. By contrast, in *Celestine*, the scissors containing marijuana residue and the empty bottle of pH reducer were found in the house's trash, and the excess electricity consumption was directly from the house. The evidence established a clear link between the indicia of marijuana use and the property in question. No such direct link exists in this case.

The government agents' inability to find any such evidence is all the more striking given the extensive surveilance of the property. The agents had surveiled Willow Tree Farm from a neighboring parcel of land in the morning and evening hours approximately ten or eleven times prior to entering the property on September 21, 2000, and surveiled the property another six to eight times before completing the search warrant affidavit on October 11. All that this lengthy surveillance revealed was 1) the presence of a black Ford pickup truck owned by Mr. Barajas–Avalos on the Willow Tree Farm and 2) the sound of pots and pans. Given the paltry amount of evidence the government agents were able to obtain from their weeks-long surveillance of the property, it is no wonder that they were tempted to enter the property without first obtaining a search warrant. However tempting it may have been, they should not have done so, for the reasons already stated in this dissent.

Unlike in *Celestine*, the confidential informant's statement that Mr. Barajas–Avalos's property was used for methamphetamine manufacture was insufficiently corroborated and was thus insufficient to support the issuance of a search warrant.

I respectfully dissent from Parts III, IV, and V of the majority opinion.